```
 1                    UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
 2                          WESTERN DIVISION

 3    UNITED STATES OF AMERICA,        Docket No. 3:15CR24

 4               Plaintiffs,           Toledo, Ohio

 5               v.                    June 29, 2016

 6    ANA ANGELICA PEDRO JUAN,

 7               Defendants.

 8    ------------------------------

 9                 TRANSCRIPT OF CHANGE OF PLEA HEARING
                   BEFORE THE HONORABLE JAMES G. CARR
10                    UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    For the Plaintiffs:  Bridget M. Brennan
                           Office of the U.S. Attorney
14                         801 Superior Avenue, W, Suite 400
                           Cleveland, Ohio 44113
15                         (216) 622-3752

16

17    For the Defendant:
                           Merl R. Dech, Jr.
18                         610 Adams Street, 2nd Floor
                           Toledo, Ohio 43624
19                         (419) 241-5506

20

21    Court Reporter:      Angela D. Nixon, RMR, CRR
                           1716 Spielbusch Avenue
22                         Toledo, Ohio 43624
                           (419) 260-5259

23

24    Interpreter:  Ellen Donohue

25
```

1              COURTROOM DEPUTY:  Case before The Court is

2    15CR24, United States of America versus Ana Angelica Pedro

3    Juan.

4              THE COURT:  Okay.  Representing the government?

5              MS. BRENNAN:  Good morning, Your Honor, Bridget

6    Brennan on behalf of the United States.

7              THE COURT:  And you are stationed where?

8              MS. BRENNAN:  Assistant U.S. Attorney in

9    Cleveland.

10             THE COURT:  Cleveland, I thought so.

11             And for the defendant?

12             MR. DECH:  Good afternoon, Judge.  Merl Dech on

13   behalf of defendant Ana Juan Pedro.

14             THE COURT:  Okay.  And Ms. Ellen Donahue is the

15   interpreter, okay.  And have you previously been sworn?

16             INTERPRETOR:  Okay.  Good.

17             THE COURT:  And please explain to the defendant,

18   who is also present, that I will try to proceed fairly

19   slowly so that you are able to interpret for her, that you

20   will let me know if I'm going -- I or somebody else is

21   going too quickly.  And if she doesn't understand

22   something, she should let you know, and I will undertake to

23   make whatever the problem is, or the uncertainty is, clear

24   so that she does understand everything, because it's very

25   important that you do understand everything.  And Mr. Dech,

1    why don't you -- you can remain -- it's very important that

2    you understand everything, and that what is happening is

3    what you expect to happen, and what you want to happen.  Do

4    you understand that?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Okay.  And I'm going to ask both

7    government and defense counsel to please make sure that I

8    touch all bases and connect all the dots on the plea

9    colloquy.  Actually, let me tell you the different steps.

10             First, I want to confirm that you are able to

11   plead, that is that your mind is clear and that you're

12   confident -- that you are confident that you understand

13   what's occurring.

14             Second, I will advise you of the charge or

15   charges against you and the consequences of conviction.  In

16   other words, the sentence that is potential if the

17   government or your lawyer have calculated how the

18   sentencing guidelines apply to you.  And I will ask them to

19   tell me that calculation.  The guidelines are just that,

20   guidelines for my decision at sentencing.  And I am to take

21   them into consideration and account, but I can impose

22   whatever sentence I conclude is appropriate in light of

23   your individual circumstances, the conduct which you plead

24   guilty, and what will be a sentence that is sufficient but

25   not greater than necessary to accomplish the purposes of

1    sentencing.

2              Then I will ask you some questions to confirm

3    that your plea is voluntary, that is it's what you have

4    decided to do, that you've not been threatened in any way

5    or promised anything by the government or anybody else to

6    cause you to plead guilty.  Once I conclude that your plea

7    is knowing, intelligent and voluntary, that is you know and

8    understand what you are pleading to, it's intelligent in a

9    sense that you are able to think clearly and enter a plea

10   and voluntary, I will ask you what your plea is.  The

11   government also, or your lawyer will advise me of the

12   general terms and conditions of your plea agreement.  And

13   once all that has occurred, I will ask you what your plea

14   is.  And then I will ask the government, and perhaps

15   yourself or your attorney, to tell me what you did that

16   constitutes a violation of the law so that I know that, in

17   fact, there's a factual basis for concluding that you did

18   break the law to which you are pleading guilty, and

19   therefore, you are, in fact, guilty.

20             And if I find a factual basis, I will accept your

21   plea of guilty and tell you about the next steps of the

22   process.  Do you understand that?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And also, in a few moments at the

25   outset, I will advise you of your basic rights, and of the

1    fact that you are giving up all those rights except your

2    right to counsel without cost to you.  And that right stays

3    with you throughout the entire proceeding regardless of

4    whether you've pled guilty or been found guilty by a jury.

5    Do you understand all that?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Okay.  Have you -- let me strike

8    that.

9              When was the last time you consumed any alcohol,

10   if any, if ever?

11             THE DEFENDANT:  I've never had any alcohol.

12             THE COURT:  Okay.  Have you ever used any drug

13   like marijuana, cocaine, methamphetamine, anything of that

14   sort?  I don't assume that you have, but I just want to

15   make sure you're not under the influence of anything of

16   that sort here today.

17             THE DEFENDANT:  None of them.

18             THE COURT:  Okay.  Are you taking any medication

19   of any kind?

20             THE DEFENDANT:  Today?

21             THE COURT:  Or recently?

22             THE DEFENDANT:  I'm taking medicine to sleep.

23   That's all.

24             THE COURT:  Okay.  Is it having any effect on

25   your ability to understand and think and communicate?

```
 1              THE DEFENDANT:  No.

 2              THE COURT:  Okay.  Are you under any sort of

 3    treatment for any sort of mental condition that might

 4    affect your judgment?

 5              THE DEFENDANT:  No.

 6              THE COURT:  Okay.  Unless either attorney thinks

 7    that there's anything further that I should ask with regard

 8    to competence to plead, I will find that the defendant is

 9    competent to plead?

10              MS. BRENNAN:  Nothing on behalf of the

11    government.

12              MR. DECH:  Nothing on behalf of the defendant,

13    Your Honor.

14              THE COURT:  And now I will ask that the defendant

15    be sworn in by the clerk.

16                    ANA ANGELICA PEDRO JUAN,

17    was herein, called as if upon examination, was first duly

18    sworn, as hereinafter certified, and said as follows:

19              THE DEFENDANT:  Yes.

20              THE COURT:  Okay.  Very good.  And your answers

21    to my initial questions were also truthful; is that

22    correct?

23              THE DEFENDANT:  Yes.

24              THE COURT:  Okay.  Do you understand that if you

25    don't tell me the truth while under oath, the government
```

1    can further prosecute you for perjury?

2                THE DEFENDANT:  Yes.

3                THE COURT:  Okay.  Do you understand that you

4    have the right to persist in your plea of not guilty and to

5    have a trial?

6                THE DEFENDANT:  Yes.

7                THE COURT:  Okay.  And do you understand that the

8    trial could be before a jury --

9                THE DEFENDANT:  Yes.

10               THE COURT:  -- rather than just one Judge?

11               THE DEFENDANT:  Yes.

12               THE COURT:  Do you understand that you would have

13   the right, if there were a trial, to be present at all

14   times --

15               THE DEFENDANT:  Yes.

16               THE COURT:  -- to confront, that is to review and

17   be in the presence of any witnesses against you --

18               THE DEFENDANT:  Yes.

19               THE COURT:  -- to have those witnesses cross

20   examined by your lawyer?

21               THE DEFENDANT:  Yes.

22               THE COURT:  Do you understand that if there were

23   a trial, nobody could make you take the stand and testify?

24               THE DEFENDANT:  Yes.

25               THE COURT:  In other words, you have the right to

1    assert a privilege -- privilege against compelled self

2    incrimination?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Do you also understand that it's the

5    government's job to present evidence sufficient for a jury

6    to find you guilty?

7              THE DEFENDANT:  Yes.

8              THE COURT:  And you have no obligation whatsoever

9    to help the government in that regard.

10             THE DEFENDANT:  Yes.

11             THE COURT:  And also, do you understand that you

12   could, if you chose to put on a defense, which is entirely

13   up to you, that --

14             THE DEFENDANT:  Yes.

15             THE COURT:  -- witnesses could be compelled to

16   come to court to help you present the defense?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Okay.  Do you understand that a plea

19   of guilty involves a waiver, that is a giving up of all of

20   those rights --

21             THE DEFENDANT:  Yes.

22             THE COURT:  -- except the right to counsel?  Your

23   plea of guilty does not affect that right.

24             THE DEFENDANT:  Yes.

25             THE COURT:  And you can and will continue to have

 1    the assistance of Mr. Dech or another competent attorney.

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  Do you also understand that as part

 4    of your plea of guilty, you are giving up your right to

 5    appeal your conviction and sentence --

 6              THE DEFENDANT:  Yes.

 7              THE COURT:  -- or otherwise to challenge it

 8    thereafter?

 9              THE DEFENDANT:  Yes.

10              THE COURT:  And that the only basis for appeal

11    would be if I were to impose a sentence in excess of what

12    the law permits me to impose?

13              THE DEFENDANT:  Yes.

14              THE COURT:  And I'll ask the prosecutor now to

15    state the nature of each of the charges against you to

16    which you are pleading guilty and the consequences of

17    conviction of each of those charges.

18              MS. BRENNAN:  Thank you, Your Honor.  The

19    defendant has agreed, pursuant to this plea agreement, to

20    plead guilty to Count 1, which is a violation of Title 18,

21    United States Code 1594, which is a conspiracy to commit

22    forced labor offense.  The maximum term of imprisonment is

23    20 years; the maximum statutory fine is $250,000; the

24    maximum period of supervised release is three years; and

25    the special assessment is $5,000, Your Honor.

 1              THE COURT:  $5,000?

 2              MS. BRENNAN:  Yes, Your Honor.  That's in the

 3     amendment.

 4              THE COURT:  And have you computed the potential

 5     guideline range?

 6              MS. BRENNAN:  Yes, Your Honor.  Based on the

 7     calculation the parties agree to, before acceptance of

 8     responsibility the defendant would be at a 29.  Would The

 9     Court like me to go through the calculation?

10              THE COURT:  No, that's okay.  Criminal history

11     category of one, I assume?

12              MS. BRENNAN:  Yes, that's what we assume as well.

13              THE COURT:  Okay.  And do you understand that --

14     and what's the guideline range -- excuse me, with

15     acceptance of responsibility what's the guideline range?

16              MS. BRENNAN:  Sure.  It would be 63 to 78 with

17     acceptance of responsibility.

18              THE COURT:  Okay.  And as I mentioned, the

19     guideline range is simply advisory.  It suggests to me what

20     others who have pled to or been found guilty of a similar

21     offense have received by way of sentence of imprisonment.

22     Do you understand that?

23              THE DEFENDANT:  Yes.

24              THE COURT:  I can be more or less severe, but I

25     cannot order you imprisoned for more than 20 years.  Do you

1    understand that?

2              THE DEFENDANT:  Yes.

3              THE COURT:  And do you also understand that upon

4    your release from whatever term of imprisonment I impose,

5    you will be deported back to your home country.  Do you

6    understand that?

7              THE DEFENDANT:  Yes.

8              THE COURT:  There's no property to be forfeited,

9    or is there?

10             MS. BRENNAN:  Not with respect to this defendant,

11   Your Honor.

12             THE COURT:  And there's no -- I do have

13   authority -- excuse me.  Do you understand that I can order

14   restitution for any economic loses that the victims

15   incurred?

16             THE DEFENDANT:  Yes.

17             THE COURT:  And I do have to impose the special

18   assessment of $5,000.

19             And that at time of sentencing I have to consider

20   various factors as required by law.  Among those are your

21   history, background and circumstances; individual

22   deterrence, that is a sentence that hopefully causes you to

23   never violate our law again; public deterrence, that is a

24   sentence that hopefully causes others not to do what you

25   did; a sentence that enhances respect for the law, and that

1    others would view as just.  Do you understand that those

2    are among the things I have to consider?

3                THE DEFENDANT:  Yes.

4                THE COURT:  Okay.  What are the terms of the plea

5    agreement?

6                MS. BRENNAN:  Your Honor, the defendant has

7    agreed to plead guilty to Count 1.  The government has

8    agreed to dismiss the following counts at the time of

9    sentencing, those would be 2 through 7, 9, 10, 12 and 13 of

10   the superseding indictment.

11               As I indicated prior, Your Honor, the guideline

12   calculation that the government and the defendant have

13   agreed to would put the defendant, before acceptance of

14   responsibility, at a total offense level of 29.

15               With respect to the appeal provision, Your Honor,

16   I would point out that there are two bases for appeal in

17   this instance.  One would be a sentence greater than the

18   statutory maximum, but then the other one was if there's a

19   dispute with respect to the criminal history computations.

20               THE COURT:  Okay.

21               MS. BRENNAN:  That was just -- the defendant has

22   agreed to a waiver of the statute of limitations.  And that

23   this is the full and complete agreement between the

24   parties.

25               If The Court would like me to go into anything

1   else, I certainly can.

2            THE COURT:  Have you had the plea agreement read

3   to you in Spanish?

4            THE DEFENDANT:  Yes.

5            THE COURT:  And did your lawyer go over it with

6   you either in Spanish or with the help of a Spanish

7   interpreter?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Did he answer any questions you may

10  have had about it?

11           THE DEFENDANT:  Yes.

12           THE COURT:  And are you fully and completely

13  satisfied that you understand what the agreement says and

14  the commitments you are making and the commitments the

15  government is making?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Okay.  Are you fully and completely

18  satisfied that Mr. Dech has undertaken to give you and your

19  case enough time and attention to prepare both himself and

20  you for each stage of the proceedings?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Is there anything that you asked him

23  to do while representing you that he failed or refused to

24  do?

25           THE DEFENDANT:  No.

1          THE COURT:  Is there anything you told him not to

2     do but he went ahead and did it anyway?

3          THE DEFENDANT:  Can you repeat that again,

4     please?

5          THE COURT:  Is there anything that you told him

6     not to do, don't do that, but he went ahead and disobeyed

7     your instruction or request and he did -- did it anyway?

8          THE DEFENDANT:  No.

9          THE COURT:  Okay.  Except for -- let me say there

10    will be a finding that the defendant is aware of her basic

11    rights, the terms and conditions of her plea agreement and

12    the mutual commitments in that agreement.  She understands

13    that by entering a guilty plea and signing that agreement,

14    she is waiving all of her basic rights, including, among

15    others, the right to trial, confrontation, jury, compulsory

16    process and self incrimination.  That she understands,

17    however -- and also she's also waiving the right to appeal.

18    And she understands, however, that she has the right to

19    counsel without cost to herself throughout this entire

20    proceeding.

21         THE DEFENDANT:  Yes, I understand.

22         THE COURT:  Okay.  Has the defendant signed the

23    plea agreement?

24         MR. DECH:  We have, Your Honor.  If I may

25    approach, I have it signed --

1            THE COURT:  Okay.  And I will go ahead and

2    approve the agreement.

3            Is this what you want to do in this case?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Has anybody threatened you or

6    somebody close to you, whether here or in Guatemala or

7    anyplace else, with any kind of harm or adverse consequence

8    if you refused to plead guilty and stood trial?

9            THE DEFENDANT:  No.

10           THE COURT:  Okay.  Except for the promises and

11   commitments that the government has made in the plea

12   agreement, has anybody, including the government, your

13   lawyer, a government agent of any sort, or anybody else

14   promised to give you anything or do anything for you to

15   cause you to plead guilty and sign the agreement?

16           THE DEFENDANT:  No.

17           THE COURT:  Okay.  So I can conclude that this is

18   your own independent and free will choice taking into

19   consideration all the circumstances as you understand them?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Okay.  There will be a finding that

22   the defendant's plea will be offered knowingly,

23   intelligently and voluntarily in light of the foregoing

24   findings.  At this time I'll ask the government to --

25   actually, I'm going to ask the defendant to offer her plea.

1    How do you plead?

2                THE DEFENDANT:  Guilty.

3                THE COURT:  Okay.  Before I can accept that plea,

4    I must be convinced that there's a factual basis for

5    finding that you committed the crime with which you are

6    charged.  I'll ask the government to tell me that basis,

7    and I may have some questions of it or the defendant or her

8    lawyer.

9                MS. BRENNAN:  Thank you very much, Your Honor.

10               The factual basis for the plea is set forth in

11   paragraph 22 of the parties' plea agreement.  I just state

12   that for the record.  But with respect to the terms stated

13   therein, from in or about March 2013 and continuing to on

14   or about December 17th, 2014, in the area of Marion, Ohio,

15   which is within this district, the defendant conspired with

16   Aroldo Rigoberto Castillo-Serrano, Conrado Salgado Soto and

17   others, both indicted and unindicted, to knowingly obtain

18   the labor of illegal aliens by means of a scheme, plan or

19   pattern intended to cause the victims to believe that if

20   they did not perform such labor, they or another person

21   would suffer, quote, serious harm, end quote, as that term

22   is defined by statute, specifically Section 1589(c)(2).

23               So more specifically, beginning in or around

24   March of 2013 and continuing, again, until December 17,

25   2014, the defendant and the others with whom I've listed,

1    provided and obtained labor and services of at least ten

2    victims, nationals of Guatemala, by the following means:

3    Force, threats of force, physical restraint and threats of

4    same to the victims and their families, serious harm or

5    threats of serious harm to the victims and their families,

6    the abuse or threatened abuse of legal process, and also a

7    scheme, plan or pattern intended to cause the victims to

8    believe that if they did not perform such labor or

9    services, they would suffer serious harm or physical

10   restraint.

11           This defendant knowingly benefited financially

12   from participation in this venture, knowing and in reckless

13   disregard that the means I just listed would be used to

14   compel the victims to engage in labor.

15           The time period here begins in at least 2008,

16   and, again, it continues to December 17th, 2014.

17   Castillo-Serrano recruited workers in Guatemala promising

18   them safe passage and remunerative work in the United

19   States.  Castillo-Serrano charged the workers $15,000 as a

20   fee for safe passage and travel here to the United States.

21   Each -- Your Honor, each of the ten victims, and then there

22   are more victims, but this indictment specifically

23   identifies ten.  He then supervised the collection of money

24   from the workers and their families.  And he also

25   controlled the set of trailers where these individuals were

1    compelled to live while they were working for Trillium Egg

2    Farm we've identified in here as the trailers -- it's an

3    address on Marion-Agosta Road in Marion, Ohio.

4         In 2013, this defendant became aware of

5    Castillo-Serano's smuggling and trafficking efforts.  In

6    March of 2013, Castillo-Serrano was compelled to go back to

7    Guatemala.  The defendant took over the operation of the

8    trailers and the supervision of the victims.

9         From in or about March 2013 to throughout

10   December of 2014, the defendant and Castillo-Serrano spoke

11   regularly by phone.  And the defendant reported to

12   Castillo-Serrano the status of the victims, including their

13   housing, their employment, the confiscation of their

14   paychecks and the amount of debts that they still owed.

15        In or about March 2014, the defendant aided and

16   abetted Castillo-Serrano in focusing recruitment efforts on

17   victims who were below the age of 18 for these specific

18   reasons; they were thought to be easier to smuggle into the

19   country, thought to be easier to control, and thought to be

20   harder workers.

21        Defendant falsely represented herself to

22   immigration officials as the minor victims' relative or

23   family member in order to have that minor victim released

24   into her custody.  She also raised her other individuals to

25   do the same, which included paying them money in exchange

1   for making false statements to immigration officials.  In

2   doing so, defendant and the other associates pledged under

3   oath to ensure the victims went to school and were

4   protected from abuse.

5            Defendant and Castillo-Serrano compelled the

6   victims to live in trailers owned or controlled by

7   Castillo-Serrano in order to keep the victims under the

8   defendant's control and to have them to pay more money in

9   the form of rent.  So in addition to paying debt, they were

10  also paying money for rent and other expenses.

11           These trailers were often in substandard

12  conditions, and the victims were not free to move out of

13  the trailers until their debts were paid.  The victims were

14  compelled to work for Trillium Farms, which is a Limited

15  Liability Corporation in Ohio.  Trilium owns and operates a

16  number of large egg farms in the Marion, Ohio area.  And

17  Trillium contracted with a number of privately-held

18  companies, including Conrado Soto's company, which is

19  called Papagos, Inc.

20           The victims were compelled to clean chicken

21  coops, load and unload crates of chickens, debeak the

22  chickens, and vaccinate chickens.  The victims regularly

23  worked six or seven days a week between eight and 12 hours

24  a day.  The work was physically demanding, dirty and, at

25  times, unsafe.

1          The minor victims and some adult victims did not

2     receive paychecks or full cash equivalence for their labor;

3     but, instead, the contractors delivered their paychecks

4     directly to the defendant or her associates.  The victims

5     were not given receipts for their paychecks or debt

6     payments.  Defendant kept some of the money obtained from

7     the victims' paychecks for her own use and transferred the

8     rest of the money to Castillo-Serrano or his associates.

9     On certain occasions, defendants -- the defendant would

10    deny a victim's request to receive more money so that they

11    could provide for basic living expenses.

12         In or around December of 2014, in the Northern

13    District of Ohio, Western Division and elsewhere, after the

14    FBI initiated an investigation into defendant's conduct,

15    defendant and Castillo-Serrano had at least one telephone

16    conversation in which they agreed to contact

17    Castillo-Serrano's juvenile son and persuade him to lie to

18    the FBI about the defendant's role in this human

19    trafficking enterprise.  Again, at the time of the call,

20    defendant knew that an FBI investigation was underway.

21         Additionally, during the same time period and

22    within this district, defendant participated in two

23    voluntary interviews with the FBI, and -- I'm sorry, an

24    interpreter was present during those interviews and advised

25    the defendant that it was a crime to lie to the FBI.

1    Despite the warning, defendant knowingly made numerous

2    materially false statements to the agents, including:  One,

3    she did not have first-hand knowledge of Castillo-Serano's

4    smuggling activities; Two, she did not withhold victims'

5    wages from them; Three, she did not send victims' wages to

6    a Guatemalan account at the direction of Castillo-Serano;

7    Four, she did not have a close relationship with

8    Castillo-Serano; Five, she was not in contact with

9    Castillo-Serrano; and, Six, she did not advise

10   Castillo-Serano's son to lie to the FBI.  This is a summary

11   of the factual basis for Count 1, Your Honor.  And also it

12   includes statements that apply to certain adjustments or

13   sentencing characteristics with respect to the guideline

14   calculation.

15           THE COURT:  Did you hear what the prosecutor just

16   told me?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Is that all true, correct and

19   accurate?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Now, I'd like you to tell me in sort

22   of more concrete terms exactly what was going on.  Maybe

23   fill me in a bit about the organization and, you know, the

24   role she actually played relative to that of others.  So

25   sort of more of a narrative rather than sort of -- in plain

1   English rather than legal English, if you could, just tell

2   me -- give me the full picture, color it up a little bit.

3          MS. BRENNAN:  Certainly, Your Honor.  I will do

4   my best to do that, and if I misspeak I would ask Mr. Dech

5   to correct me.

6          The defendant was in a romantic relationship with

7   Castillo-Serrano.  And to that end, when he left the

8   country, she remained in the United States.  She worked to

9   keep up the human trafficking organization that they had

10  here.  She participated in taking children -- or having

11  children delivered to the egg farm and also making sure

12  they came back.  She assigned them certain trailers within

13  to live, and she knew that the trailers were in rather

14  substandard conditions.  Some of them did not have running

15  water, so I can't say that they all had the same --

16         THE COURT:  Conditions?

17         MS. BRENNAN:  Exactly.  But as a general, some of

18  them did not have heat, some had broken windows.  They

19  were -- there was no bed.  If I can remember every picture

20  correctly, there are just little mats laid out on the

21  floor, food strewn about, and they were unkept in that

22  sense.

23         And in December of 2014, in the Northern District

24  of Ohio -- sorry, did it go off?  Is it going now?  I think

25  so.

1          Okay.  With respect to the smuggling effort and

2     getting the children, there is a program that is run

3     through HSI, and it is --

4          THE COURT:  What is that?

5          MS. BRENNAN:  So Department of Homeland Security

6     essentially runs this program, Your Honor.  And what it

7     does is when there are unaccompanied minors being brought

8     into the United States, there is a program in which family

9     members, close personal representatives within the United

10    States, can essentially take on a foster status for them.

11    So it's very similar to foster children who are U.S.

12    citizens.

13         Along those lines, the defendant used false

14    names, and she misrepresented herself to be a person who

15    could actually take these children in and provide for them.

16    Like I mentioned, that they would have school, that they

17    would be taken care of, that they would have adequate

18    housing, that they would not suffer any form of abuse.  So

19    she lied on these forms.  She used false names to do it as

20    well.  When she could not be the only one who was signing

21    these forms and making these false representations, she

22    used others to help her in that way.  And that's part of

23    the way that these children ended up coming into the United

24    States.

25         Once here, she then assisted the effort to make

1    sure that they were brought to Marion, Ohio so they could,

2    in fact, live in those trailers and work at the egg farm.

3            THE COURT:  Okay.  Did you hear that additional

4    information she gave me?

5            THE DEFENDANT:  Yes.

6            THE COURT:  So I gather that, for a period of

7    time at least, she assisted the -- the person with whom

8    they would be designated, and then she's basically the

9    principal conducting the overall operations; is that

10   correct?

11           MS. BRENNAN:  In as much -- and when you say

12   principal, I can say that he directed things from Guatemala

13   when he was returned there so she would continue to assist

14   him.  I don't know that I would ever say that she became

15   the acting principal.

16           THE COURT:  Okay.  But she remained subject and

17   subordinate to his direction and control?

18           MS. BRENNAN:  That's our understanding, Your

19   Honor.

20           THE COURT:  And she actively implemented the

21   instructions that she got?

22           MS. BRENNAN:  Yes, Your Honor.

23           THE COURT:  Did any of the victims that you've

24   identified, or any others not named in the indictment but

25   about whom you are familiar or acquainted, did any of them

1   ever pay off the $15,000 fee, do you know?

2          MS. BRENNAN:  Your Honor, actually that's a very

3   good question.  I don't know that anyone ever did.  I'm

4   looking at Merl, I don't --

5          MR. DECH:  I don't know -- Judge, I don't know if

6   actually it was completely paid off.  There was a

7   collection process through the conspiracy in which money

8   was collected and then was forwarded back to Guatemala to

9   pay off the debt for the, quote, coyote.

10         MS. BRENNAN:  Your Honor, we did recover records

11  where you could see that the debt was being --

12         THE COURT:  Reduced?

13         MS. BRENNAN:  Yes.  But if anyone ever actually

14  paid off, I don't know.

15         THE COURT:  Okay.  And how much were the victims

16  being paid on a weekly, monthly -- and were they only

17  paid -- well, of course they're working -- I assume they're

18  working 12 months of the year in that kind of operation.

19  But either an hourly, daily, weekly or whatever basis, how

20  much were they being paid?

21         MS. BRENNAN:  I believe it varied per child, but

22  it would be a couple hundred to a few hundred dollars per

23  week.  But then a portion of that was designated for the

24  coyote fee, and a portion of that was designated for rent

25  to live in these trailers, so a significant portion of it

1    was subtracted.  And then some of these children would try,

2    if they could, to voluntarily send some of the money back

3    to their families.

4            THE COURT:  Okay.  And were any of the children

5    ever allowed to leave, for example, to return to Guatemala

6    or go elsewhere?

7            MS. BRENNAN:  I, at this time, only feel

8    comfortable speaking to the ones with whom I've spoken and

9    reviewed their interviews, and they were not permitted to

10   leave.

11           THE COURT:  Okay.  So it was, comparatively put,

12   a form of indentured servitude?

13           MS. BRENNAN:  Yes, Your Honor.

14           THE COURT:  Okay.  Once again, has the defendant

15   heard and understood; and, if so, does she agree with the

16   statements of the attorney and the answer to my questions?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Okay.  I'll find there's a factual

19   basis for the plea.  In light of that and the other

20   findings that I've previously made in this proceeding, I

21   will accept the plea and find the defendant guilty, subject

22   to hearing from either attorney as to whether I have missed

23   anything with regard to the Rule 11 requirements?

24           MS. BRENNAN:  No, Your Honor.  I think The Court

25   has been complete.  Thank you.

```
1            THE COURT:  Okay.  Mr. Dech?

2            MR. DECH:  Yeah, I believe so also, Your Honor.

3            THE COURT:  Okay.  The defendant will be found

4   guilty.  Judgment will be entered accordingly.  And the

5   matter will be continued for purposes of sentencing.  And

6   sentencing will be -- is presently set for June 27th, 2016.

7   I'm not sure I'll be here then, okay, but if not, it will

8   be otherwise set.  Might be better, Deanna -- I just don't

9   know my plans, maybe put it around the 4th of July, maybe

10  July 3rd or day after or whatever.  We'll see, but

11  sentencing will occur in about four months.

12           In the meantime, you'll remain in custody.  A

13  person from the United States Pretrial Service and

14  Probation Office will meet with you.  Where is she

15  presently detained?

16           MR. DECH:  She's at Lucas County Jail, Your

17  Honor.

18           THE COURT:  Is that where she will remain, do you

19  know?

20           MR. DECH:  I believe so.

21           THE COURT:  Okay.  In any event, a person will --

22  a probation officer will meet with you to get information

23  about your history and background, your family, marital

24  status, if any, children if any, substance abuse,

25  education, employment records and so forth.  You have the
```

```
 1    absolute right to have your lawyer with you, and obviously
 2    an interpreter as well during that session or sessions.
 3    And I would ask the probation office to notify Mr. Dech in
 4    advance, and then obviously, Mr. Dech, I would recommend
 5    that you be with your client while that interview's being
 6    conducted.  The probation officer then will prepare what is
 7    called a Presentence Report.  A copy will be provided to
 8    Mr. Dech.  He'll go over it with you, with the aid of an
 9    interpreter, to make sure that the information is correct
10    and there's nothing that should either be added or deleted
11    from the report.  Then a final report, subject to any
12    corrections, changes or objections by Mr. Dech and
13    yourself, will be prepared and given to you in advance of
14    trial.  And, once again, Mr. Dech will go over that with
15    you with the aid of an interpreter before sentencing,
16    rather.  And then the case will be set for sentencing.
17            Anything further on the part of the government?
18            MS. BRENNAN:  No, thank you.  Your Honor.
19            THE COURT:  Mr. Dech?
20            MR. DECH:  Nothing further.  Thank you, Judge.
21            THE COURT:  Okay.  That will conclude this
22    proceeding.
23
24
25
```

```
 1                  C E R T I F I C A T E

 2

 3           I certify that the foregoing is a correct transcript

 4    from the record of proceedings in the above-entitled matter.

 5

 6    s:/Angela D. Nixon              October 9, 2020

 7    --------------------------                -----------

 8    Angela D. Nixon, RMR, CRR       Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```